IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
October 10, 2023 Session

**STATE OF TENNESSEE v. DANTIS LAKKA-LAKO**

**Appeal from the Criminal Court for Davidson County**
**No. 2019-A-739        Jennifer L. Smith, Judge**

—————————————————————

**No. M2023-00080-CCA-R3-CD**

—————————————————————

A Davidson County jury convicted the Defendant, Dantis Lakka-Lako, of one count of especially aggravated robbery, two counts of aggravated rape, one count of especially aggravated burglary, and two counts of theft of property. The trial court sentenced the Defendant to an effective sentence of fifty years of incarceration. On appeal, the Defendant asserts that the trial court erred when it denied his motion to suppress his confession. He additionally contends that the evidence was insufficient to support his convictions for especially aggravated robbery and aggravated rape, and that the trial court erred when it sentenced him. After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOHN W. CAMPBELL, SR., and KYLE A. HIXSON, JJ., joined.

Manuel B. Russ (on appeal) and Brent Horst (at trial), Nashville, Tennessee, for the appellant, Dantis Lakka-Lako.

Jonathan Skrmetti, Attorney General and Reporter; Andreé Sophia Blumstein, Solicitor General; Philip Hammersley, Assistant Solicitor General; Glenn R. Funk, District Attorney General; and Doug Thurman and Kristen E. Stonehill, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from the Defendant's assault and rape of the victim inside her Nashville apartment. The victim, who was pregnant at the time, jumped out of her third-floor apartment window to escape the Defendant. The Defendant then stole the victim's

husband's vehicle and the victim's credit cards, which he later used to make purchases. For these offenses, a Davidson County grand jury indicted the Defendant for one count of especially aggravated robbery, two counts of aggravated rape, one count of especially aggravated burglary, and two counts of theft of property.

## A. Motion to Suppress

Prior to trial, the Defendant filed a motion to suppress his statement to the police on the grounds that it was involuntary as a result of coercion and misleading tactics by law enforcement, including statements made by one detective minimizing the impact the Defendant's statements would have on his future.

The trial court held a hearing, at which the following evidence was presented: Detective Kimberlin Rothwell testified that she worked for Metro Nashville Police Department ("MNPD") in the sex crimes unit. On September 5, 2018, Detective Rothwell was called to Vanderbilt University Medical Center about a female who was the victim of a home invasion. The victim, who had been injured, reported being sexually assaulted inside her apartment. The victim said that she escaped her attacker by using a knife to slash open a window screen and jumping out of her third-story apartment unit. The victim was pregnant and suffered multiple injuries, including a fractured pelvis.

Detective Rothwell received information from the victim's husband that her credit card had been used at Mapco. Mapco provided their surveillance recording, which showed the Defendant using the victim's credit card. The Defendant's fingerprints were also identified on the victim's husband's vehicle, which was stolen after the assault. Based on this, law enforcement obtained a search warrant for the Defendant's residence that he shared with his mother and siblings. Law enforcement executed the warrant on September 18, 2018, which was the Defendant's sixteenth birthday. On that same day, law enforcement asked to speak with the Defendant, and the Defendant willingly spoke to the detective in the detective's vehicle in the parking lot of the Defendant's residence's complex. The Defendant was not handcuffed. Detective Rothwell was dressed in plain clothes and driving an unmarked vehicle. Detective Rob Carrigan also attended the interview. Detective Rothwell sat in the driver's seat, the Defendant in the front passenger seat, and Detective Carrigan in the backseat. Detective Rothwell asked the Defendant if he wished to waive his *Miranda* rights, and the Defendant indicated that he did. The Defendant also signed a written waiver confirming this. The Defendant indicated that he had completed the eighth grade and was not under the influence of alcohol or drugs.

The interview was audio-recorded, and the trial court admitted a transcript of the interview as an exhibit to the hearing. The Defendant did not ask to speak to a lawyer or

2

with his family, who remained inside their apartment. The Defendant indicated that he had retained a lawyer in the past for other criminal matters.

During the interview, which Detective Rothwell stated lasted one hour and twenty minutes, the Defendant did not ask for a break, and the detectives did not threaten him. At some point during the interview, the Defendant asked to speak to Detective Rothwell alone, and Detective Carrigan exited the police vehicle. The Defendant initially admitted to using the victim's stolen credit card but said he was not involved with the robbery or rape. He blamed the robbery and rape on someone named "Joe Joe." By the end of the interview, the Defendant admitted to being inside the victim's apartment, then to taking a knife from the apartment, and then to attempting to rape the victim. The Defendant was arrested and charged in juvenile court before the case was transferred to general sessions court. Detective Rothwell said that she would have brought the Defendant's mother to the vehicle if the Defendant had so requested.

On cross-examination, Detective Rothwell stated that Detective Carrigan got out of the police vehicle halfway through the interview, and Detective Rothwell finished it alone. Detective Rothwell then got out of the car, and Sergeant Sean Rohweder got in and spoke to the Defendant. Sergeant Rohweder's portion of the interview lasted twenty to thirty minutes. Detective Rothwell agreed that the Defendant was not told he was free to leave the interview but never indicated he wanted a break or asked to leave. The Defendant was respectful and compliant.

Sergeant Rohweder testified that he joined the other officers at the Defendant's apartment complex. Thereafter, he became involved in the Defendant's interview being conducted inside the police vehicle. He recalled that Detective Carrigan stepped out of the vehicle and told Sergeant Rohweder that the Defendant appeared to want to be cooperative with the investigation but was somewhat apprehensive. After Detective Rothwell finished speaking with the Defendant, Sergeant Rohweder got into the police vehicle and spoke with him. At that point, Sergeant Rohweder was under the impression that the Defendant had admitted to being present in the victim's apartment but had not "fully confessed" to sexually assaulting the victim. The Defendant did not "fully confess to raping her" during Sergeant Rohweder's portion of the interview.

The transcript of the interview indicates that Detective Rothwell told the Defendant explicitly that he was not in custody. She explained his *Miranda* rights to him which she explained meant he "[didn't] have to talk" to law enforcement. The Defendant indicated in the affirmative that he understood his rights and wished to be interviewed. Detective Carrigan encouraged the Defendant to be honest and not dig himself into a hole. The Defendant admitted to seeing the victim and asking for her phone. He admitted to going inside her apartment and taking a knife from the victim's kitchen. Detective Rothwell

3

exited the vehicle and, when she returned, asked if the Defendant needed to take "a minute" and the Defendant said he was fine. The Defendant admitted to going into the victim's bedroom to look for items to steal but denied attempting to rape her.

Detective Rothwell exited the vehicle again and Sergeant Rohweder replaced her. Sergeant Rohweder told the Defendant, in essence, that he supported the Defendant as if he was his own son. The Defendant replied that he had made "too big of a mistake." Sergeant Rohweder replied that it did not have to amount to a "forever mistake." Sergeant Rohweder encouraged him to clear his conscience and tell the truth. The Defendant said he saw his crime as an "opportunity" to steal from the victim and make money to live. He took the victim's purse and a locked safe. The Defendant said he told the victim to "get on her knees" but she was "fighting" back. The Defendant attempted to take his pants off but was unable to. He denied raping the victim.

Defense counsel argued that, based on the evidence presented, a reasonable sixteen-year-old would not have felt free to leave and was therefore in custody.

The trial court denied the Defendant's motion to suppress, stating the following in an order:

> The Defendant now challenges the admissibility of the statements made to the third officer, Sergeant Rohweder, on grounds that his statement was a product of coercion and illusory promises. At the suppression hearing, defense counsel conceded that the statements made to Detectives Rothwell and Carrigan in the first hour and twenty minutes of the interview were voluntary and thus admissible.
>
> . . . .
>
> The Court finds from the totality of the circumstances that the Defendant's statement was voluntarily given. Detective Rothwell and Sergeant Rohweder testified at the hearing on [the] Defendant's motion, giving this Court the opportunity to see, hear, and assess their credibility. The Court also reviewed a recording and transcript of Detective Rothwell, Detective Carrigan, and Sergeant Rohweder's September 11, 2018, encounter with the Defendant.
>
> Looking at the totality of the circumstances, the encounter between the detectives and the Defendant took place on the morning of September 11, 2018, and lasted approximately one hour and fifty minutes. Detective Rothwell and her partner initiated the encounter with the Defendant validly

4

by executing a search warrant at the Defendant's residence and asking if they could speak with him outside in their unmarked car. The Defendant accompanied the detectives voluntarily. He was not restrained by handcuffs. Detective Rothwell informed the Defendant that he was not in custody, and there is nothing [in] the record to suggest that he did not understand that information.

For the duration of the interview, the Defendant sat in the passenger seat of the unmarked police car. He spoke with three different officers. Detective Rothwell and her partner Detective Carrigan were present in the beginning of the interview. They were stern but polite throughout the process. In the middle of the interview, the Defendant asked to speak with only Detective Rothwell, at which time Detective Carrigan obliged and stepped out of the vehicle. Sergeant Rohweder joined Detective Rothwell for the last thirty minutes of the interview and was calm and polite when addressing the Defendant.

Detective Rothwell informed the Defendant that they had surveillance video of the Defendant coming out of the victim's apartment; they found the Defendant's fingerprints inside the victim's stolen vehicle, which was found at the Defendant's apartment complex; they had video of the Defendant at multiple businesses using the victim's stolen credit cards; and they had DNA from the victim's assailant. None of the detectives threatened or abused the Defendant in any way but explained that they were giving him the opportunity to explain his motivations and take responsibility for his actions. The Defendant was cooperative, though not initially forthcoming. The Defendant admitted to the robbery allegations after learning that the Detectives had video footage of the apartment complex and saw the Defendant entering and exiting the victim's apartment alone. Although the Defendant did not initially admit to the sexual assault, he ultimately told Sergeant Rohweder that he directed the victim to get on her knees but claimed he was unsuccessful and his pants never came off.

There is nothing about the personal characteristics of the Defendant, aside from his age, that would make him particularly susceptible to coercion. The Defendant had just turned sixteen at the time of the interview. He was a freshman in high school and was able to read and write English. The Court credits the testimony of Detective Rothwell that the Defendant gave no indication that he did not understand what was going on. The Defendant denied being under the influence of drugs or alcohol. [The] Defendant also

gave no indication that he was sleep deprived or in need of food or medical attention.

The Defendant was read his *Miranda* warnings and indicated that he understood those rights and still wanted to talk. The Defendant signed a waiver of rights, which was admitted at the suppression hearing as Exhibit 1. He had previous experience with law enforcement and admitted he had previously been advised of his rights during an earlier encounter with police and had experience with an attorney in the past. Although the Defendant's mother was in close proximity inside the apartment during the interview, the Defendant never asked that she or any other adult be present during questioning. The Court credits the testimony of Detective Rothwell that the Defendant's mother never tried to join the Defendant during the interview.

The Defendant conceded at the suppression hearing that his statements to Detectives Rothwell and Carrigan were voluntary. Nevertheless, the Court finds nothing in Detective Carrigan's statements to the Defendant that would render his statement involuntary. In *Callahan*, the Tennessee Supreme Court upheld the admissibility of a juvenile's statements made after *Miranda*, explaining that "neither the Tennessee Constitution nor the United States Constitution requires police officers to inform the defendant that he may be prosecuted as an adult." 979 S.W.2d at 578. Detective Carrigan's interactions with the Defendant fall well within legal bounds and did nothing to overbear the Defendant's will.

The Court also finds no fault with Sergeant Rohweder's statements to the Defendant that he would give his son the same advice and, "This isn't a permanent thing. It's not a forever thing. It's not a 'I'm going to spend the rest of my life in jail thing.'" The Court is guided by the decision of the Sixth Circuit Court of Appeals in *United States v. Charlton*, 737 Fed. Appx. 257, 261 (6th Cir. 2018), cert. denied, 139 S. Ct. 390 (2018), in which the court ruled that officers' offer to help the defendant and to protect his family if they could were not a promise of leniency and were not objectively coercive.

Similarly, Sergeant Rohweder's statements were not objectively coercive. Nor did he make any improper promise of leniency. Persuasion is not the same as coercion. *See id.* The Defendant's decision to talk with detectives appears to this Court to have been motivated by his realization of the strong evidence against him rather than by any alleged misconduct of Sergeant Rohweder. Moreover, the Defendant had already admitted to other

6

officers that he was present in the victim's apartment before Sergeant Rohweder joined the conversation.

Considering the totality of the circumstances, the Court concludes that the Defendant's statements to detectives were voluntary and not contaminated by duress or coercion.

## B. Trial

At the Defendant's trial, the parties presented the following evidence: The victim, who testified through an interpreter, stated that she was from Thailand and that English was her second language. In 2018, she was living in a Nashville apartment with her husband and was five months pregnant. The day of the incident, she took her mother in her husband's car to a doctor's appointment and then went to the grocery and the post office. The victim's husband had gone to work in her car. After her errands, the victim returned to her apartment complex around 3 p.m. and observed a teenage boy sitting on the stairs of her apartment building. The victim took two trips to get her groceries from her car to her apartment. On the second trip, the boy asked her for her phone. She took her groceries inside her apartment and locked her door. The victim later identified the boy at her apartment building as the Defendant sitting in the courtroom.

The victim laid down on her bed and soon after the Defendant entered her bedroom. He was wearing gloves and holding a knife from the victim's kitchen. The Defendant told her not to scream or make noise and held her at knifepoint to keep her from leaving the room. The Defendant took the cash that was in her purse, about $600. Then he grabbed her wrist and twisted it behind her back. The Defendant told her to perform oral sex on him and took off his pants. He made the victim get on her knees and tried to force her mouth onto his penis. The victim squeezed his testicles while refusing and struggling to get away from him. The Defendant then put his mouth on her vagina and put his tongue inside. He then penetrated her vagina with his penis several times. The victim continued to struggle, so the Defendant was not able to ejaculate.

The victim tried to push the Defendant away and ended up smashing a bottle on his head causing his head to bleed. He left the bedroom but left the knife behind, which the victim grabbed. The victim thought the Defendant would kill her, and she looked for ways to escape. She eventually cut a hole in the window screen and jumped out of her apartment window, which was on the third level. She ran to the parking lot and banged on a car to set off the car alarm. The victim then ran to a bystander who called the police. The victim watched the Defendant drive away in her husband's car. The keys had been hanging on the wall inside her apartment. The police responded, and the victim went to the hospital.

The victim was shown a photographic lineup at the hospital, but she could not identify her attacker.

Regarding her injuries, the victim stated that she suffered a pelvic crack on her posterior. She needed surgery, but did not have it because of her pregnancy. She suffered severe pain, which remained three years later at the time of trial. As a result of her injury, she was not able to give birth vaginally, but instead needed to have a cesarean section. The victim sustained an injury to her arm that healed on its own, but resulted in lingering pain. The victim was hospitalized for two to three months and struggled to walk well, so she required a wheelchair at times. The victim described the incident as "terrifying" and said she has since been "afraid of everything." She stated that she lost her trust in people and no longer had loving feelings towards kids. The victim stated that the Defendant punched her twice in the face with a closed fist.

The victim's husband testified that he was born in Burma and that English was his second language. The victim and her husband moved into their apartment and the crime occurred the next day. The victim's husband received a phone call at work and was told to go to the hospital to meet his wife. She appeared badly injured and could not move easily. The victim was in the hospital for an extended period and then went to live at her parents. She suffered continual pain and limited movement.

While the victim was in the hospital, her husband returned to their apartment to retrieve some items and found it in disarray. He observed the broken window and many items out of place. The victim's husband noticed transactions on the victim's credit card at Mapco, Walmart, and McDonald's. The victim was still in the hospital at that time. Police eventually recovered the stolen car with trash and nicotine products inside, none of which belonged to the victim or her husband. The victim's husband testified that a jewelry safe was stolen from their apartment.

Heather Kennedy testified that she was an emergency room nurse at Vanderbilt University Medical Center and examined the victim there. Ms. Kennedy confirmed that the victim was five months pregnant. The victim stated that the sexual assault occurred in her bedroom and that the Defendant did not ejaculate inside her. The victim indicated that the Defendant had licked her vagina. Ms. Kennedy took DNA samples from inside the victim's mouth, under her fingernails, and her genital area.

Officer Richard Olive with the MNPD testified that he responded to the victim's apartment and observed her substantial injuries. She appeared "traumatized, bleeding, multiple parts of her body having difficulty moving."

Investigator Lynnette Mace testified that she worked as a crime scene investigator for MNPD and responded to the victim's apartment. Inside the bedroom she found a broken beer bottle and the window screen cut open, consistent with the victim's testimony. Investigator Mace found a kitchen knife on the ground outside the victim's window.

Officer Gerald Gomes with the MNPD testified that he received a tip about the location of the victim's stolen vehicle, which was at another apartment complex. Officer Gomes ran the tag number on the vehicle, and it was registered to the victim's husband. The vehicle was towed from the scene and processed for evidence. Lorita March with the MNPD Crime Lab received fingerprints that were lifted from inside the stolen vehicle registered to the victim's husband. Found inside the vehicle was a bottle of lotion that the victim's husband indicated did not belong to him. Ms. Marsh testified that the Defendant's fingerprints were found on the bottle.

Julie Ellis, with the MNPD forensic biology unit, testified that she analyzed DNA samples taken from the victim, her husband, and the Defendant. She also analyzed samples taken from the stolen vehicle, the kitchen knife, and items found inside the victim's apartment. Testing indicated the presence of the Defendant's DNA under the victim's fingernails. DNA consistent with the Defendant was also found on a paper towel found inside the victim's apartment and on the steering wheel and gear shifter of the stolen vehicle.

Upon hearing this evidence, the jury convicted the Defendant of one count of especially aggravated robbery, two counts of aggravated rape, one count of especially aggravated burglary, and two counts of theft of property.

## C. Sentencing

The trial court held a sentencing hearing at which the presentence report was admitted into the record. The presentence report indicated that the Defendant had been adjudicated delinquent in juvenile court for six offenses, offenses that would have been felonies had they been committed by an adult. The following evidence was presented: The Defendant's sister testified that the Defendant was one of six children. She characterized the Defendant as loving and caring, a "helper" who had never been violent towards anyone. She apologized on behalf of the Defendant. Other family members testified favorably in support of the Defendant. The State did not present any additional evidence. At the conclusion of the hearing, the trial court made the following statement:

> In determining the appropriate sentence in this case, the Court has considered the evidence presented at the trial, and I have made a point to go

9

back and very carefully review my notes from the trial and the evidence presented in this sentencing hearing.

The Court also received a presentence report which was admitted into evidence as Exhibit 1.

The Court has considered the statutory sentencing principles that are embodied in Tennessee Code Annotated 40-35-103. The Court has considered the nature and characteristics of the conduct involved in this case and the evidence and information offered by the parties with respect to enhancing and mitigating factors.

The Court has also considered any evidence before it today that would have any bearing one way or another on the [D]efendant's potential for rehabilitation and treatment.

The [D]efendant is a Range [I] standard offender, but he stands convicted today of especially aggravated robbery, a Class A felony, which carries a range of punishment for a standard offender of 15 to 25 years in prison.

He has been convicted by a jury of two counts of aggravated rape, also a Class A felony, which carries a range of punishment of 15 to 25 years in prison.

He stands convicted of aggravated burglary, a Class C felony, that would carry a range of 3 to 6 years in prison.

And he stands convicted of two counts of theft, one count at a value over $2500, which is a Class D felony, which carries a 2 to 4-year prison range and one count of misdemeanor theft which carries jail time up to 11 months and 29 days.

In determining where to place the sentence within those applicable ranges, the statute and the law requires that the Court consider certain statutory enhancement factors and mitigating factors. And the State has offered a number of factors that it believes to be applicable in this case in terms of enhancement.

. . . .

10

The State offers enhancement factor number 6, that the personal injuries inflicted upon or the amount of damage to property sustained by or taken from the victim was particularly great. And the Court does find that that enhancement factors applies and the Court finds that enhancement factor carries great weight.

[H.H.] testified that she was no longer able to give birth naturally after this incident, in which she was forced to literally leap from a three-story window to save her own life. At the time of the trial she was still in physical pain and described her psychological suffering. She was also in the hospital for a month after this incident happened which indicates, again, the severity of her injuries. And so[,] for all of these reasons, that factor applies and is very weighty.

. . . .

Factor number 9, the [D]efendant possessed or employed a firearm or explosive device or other deadly weapon during the commission of the offense was clearly established in proof at the trial, and the Court does apply that factor with respect to counts 3, 4, 5, and 6.

Factor number 10, the [D]efendant had no hesitation about committing a crime when the risk to human life was high. And the Court does apply that and specifically with respect to [the victim's] unborn child. The victim was obviously pregnant at the time of this incident. The [D]efendant would have known she was pregnant. And so for that reason, that factor does apply.

Factor 13, at the time of the felony in these -- the felonies in these cases, the [D]efendant was released on probation. Again, that factor was established in the proof at the trial today and is set out in Exhibit Number 2.

And finally, the [D]efendant was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult was also established clearly by the collective Exhibit Number 2, which indicates that the [D]efendant had been previously adjudicated delinquent for six acts that would constitute felonies if they had been committed by an adult. And that is that's an extensive, extensive juvenile record that proceeded this incident.

So[,] with respect to enhancement factors, the Court does find five factors that are clearly established by the proof and in this Court's view quite weighty considering the totality of the circumstances.

In mitigation, the defense presented several character witnesses who came here to testify on the [D]efendant's behalf, family members, close friends, a supervisor from a juvenile facility. And I appreciate all of you coming here to testify.

. . . .

What I did not hear today, however, and what I had hoped to hear today, was any expression from this [D]efendant, the [D]efendant who stands convicted of a number of very violent and serious offenses. I heard no remorse. I heard no explanation, no reason why a pregnant woman who was minding her own business, taking in groceries to a new apartment would be viciously attacked, raped in her own home, forced to fling herself out a third-story window, shattering her pelvis, and endangering the unborn child that she carried in her body.

I had hoped to hear that because this -- these types of acts are always inexplicable and sometimes an explanation provides a little bit more weight to the testimony about the defendant being a good person. Because it is impossible for this Court to reconcile the testimony of the family members that the [D]efendant is a good person, a polite person, a mannerly person with the testimony that this Court heard, that the [D]efendant raped a pregnant woman and forced her to fling herself out a third-story window. It is irreconcilable because a good person would not do that, okay, without some reason. And the reason is not known to me. The reason is not known to the Court. And so[,] without a reason, then I am forced to look at nothing but this event.

So[,] taking all of that into consideration, you know, we have got multiple applicable enhancement factors and very little mitigation and no explanation.

Before going to the length of sentence, I am going to move directly into the consecutive sentencing, because the State has asked that these are multiple offenses and this Court has the discretion if certain statutory considerations are met to run any or all of these sentences consecutively.

12

And the Court does find that at least three statutory bases for consecutive sentencing are established here.

The [D]defendant is an offender whose record of criminal activity is extensive. Not only do we have multiple convictions in the incident case, but his juvenile record is extensive, as I have previously stated.

The [D]efendant is sentenced for an offense committed while on probation. And he had just been placed on probation and yet still committed the crimes here.

And finally, the Court does agree with the State that the [D]efendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high.

In applying this factor, the Court does find that the circumstances surrounding the offense were aggravated for all of the reasons as previously stated. The victim was a small woman, pregnant, alone, had a language barrier, ended up leaping multiple stories, sustaining serious injuries. An extended sentence is necessary to protect the publi[c].

The Court also finds that the aggregate length of the sentences reasonably relates to the [offenses] for which the [D]efendant is convicted.

So[,] with all of those findings, the Court sentences the [D]efendant as follows:

As to Count 1 on the offense of especially aggravated robbery, the Court sentences the [D]efendant to the maximum term of 25 years.

On Count 2, the offense of aggravated rape, the Court sentences the [D]efendant to the maximum term of 25 years.

As to Count 3, on the conviction for aggravated rape, the Court sentences the [D]efendant to the term of 25 years.

For his conviction of aggravated burglary, the Court sentences the [D]efendant to 6 years.

13

For his conviction for theft over $2500, the Court sentences the [D]efendant to 4 years.

For his sentence for theft at a value under $1,000, the Court sentences the [D]efendant to 11 months and 29 days.

The sentences in counts 1 and 2, especially aggravated robbery and aggravated rape, will be run consecutively.

The sentences in counts 3, 4, 5, and 6 will run concurrently with the sentence in Count 1.

The Defendant received a total effective sentence of fifty years of incarceration. It is from these judgments that the Defendant appeals.

## II. Analysis

On appeal, the Defendant asserts that the trial court erred when it denied his motion to suppress his statement to "members of MPD." He also asserts that the evidence is insufficient to support his convictions for aggravated rape and especially aggravated robbery. Finally, he contends that the trial court erred when it sentenced him.

## A. Suppression

The Defendant contends that the trial court erred when it denied his motion to suppress his statement to members of the MNPD. He contends that his statement was not knowing and voluntary because, based on his juvenile status, his waiver of his rights was not valid. The State responds that the Defendant did not challenge the validity of his waiver at trial, and thus, his argument on appeal amounts to a new theory and is subject to plain error review. The State contends that the Defendant cannot establish plain error because 1) no *Miranda* violation occurred because the Defendant was not in custody when he made the statement; 2) if the Defendant was in custody, he validly waived his *Miranda* rights; and 3) any *Miranda* violation that did occur did not affect the Defendant's substantial rights or create a substantial injustice.

### 1. Level of Review

The State contends that the Defendant's argument on appeal was not properly presented at trial, and thus that his argument on appeal pursuant to a new theory is entitled only to plain error review. The Defendant does not appear to address this issue in his brief.

The Defendant motioned to suppress his statements made in the police vehicle. He eventually conceded that his statements to Detectives Rothwell and Carrington were voluntary but challenged the admissibility of his statement to Sergeant Rohweder. At the suppression hearing, he argued that a reasonable person would not have felt free to leave and therefore he was in custody.

The stated objections did not include the issue of the validity of his *Miranda* waiver based upon his status as a juvenile. "Appellate review generally is limited to issues that a party properly preserves for review by raising the issues in the trial court and on appeal." *State v. Minor*, 546 S.W.3d 59, 65 (Tenn. 2018) (citing Tenn. R. Crim. P. 51; Tenn. R. Evid. 103(a)-(b); Tenn. R. App. P. 3(e), 13(b), 27(a)(4), 36(a)); *State v. Bledsoe*, 226 S.W.3d 349, 353-54 (Tenn. 2007). In keeping with these principles, a party is bound by the ground asserted when making an objection to the admission of evidence and cannot assert a new or different theory to support the objection in the motion for new trial. *State v. Adkisson*, 899 S.W.2d 626, 634-35 (Tenn. Crim. App. 1994). As the Defendant's objection to the statement was only made on the grounds of it being custodial, in keeping with the foregoing, we are constrained to review this issue pursuant to the plain error doctrine.

The doctrine of plain error applies when all five of the following factors have been established:

(a) the record must clearly establish what occurred in the trial court;
(b) a clear and unequivocal rule of law must have been breached;
(c) a substantial right of the accused must have been adversely affected;
(d) the accused must not have waived the issue for tactical reasons; and
(e) consideration of the error must be "necessary to do substantial justice."

*State v. Page*, 184 S.W.3d 223, 230-31 (Tenn. 2006) (quoting *State v. Terry*, 118 S.W.3d 355, 360 (Tenn. 2003)) (internal brackets omitted). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." *Id.* at 231.

### 2. Statement to Law Enforcement

We review for plain error the Defendant's argument that his waiver of his rights was unknowing and involuntary, based on the totality of the circumstances including his age, the location and his lack of true understanding of his rights.

The Fifth and Fourteenth Amendments to the United States Constitution and article I, section 9 of the Tennessee Constitution protect an accused's privilege against self-

15

incrimination. Moreover, the United States Supreme Court held that the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination requires police officers, before initiating custodial interrogation, to advise the accused of his right to remain silent and his right to counsel. *Miranda v. Arizona*, 384 U.S. 436, 478-479 (1966). Assuming the use of these procedural safeguards by police interrogators and provided that the accused is acting voluntarily, knowingly, and intelligently, an accused may waive his Miranda rights. *State v. Mann*, 959 S.W.2d 503, 529 (Tenn. 1997).

The Defendant lists the factors contained in our supreme court's opinion in *State v. Callahan* as the framework for our consideration of the voluntariness of a juvenile's waiver of his right against self-incrimination. 979 S.W.2d 577 (Tenn. 1998). The defendant in *Callahan* was fifteen years old at time he waived his rights and gave a statement confessing to killing his mother and sister. In analyzing the validity of his waiver, our supreme court concluded that juvenile waivers would be analyzed under a totality-of-the-circumstances test requiring consideration of the following factors:

> (1) consideration of all circumstances surrounding the interrogation including the juvenile's age, experience, education, and intelligence;
> (2) the juvenile's capacity to understand the *Miranda* warnings and the consequences of the waiver;
> (3) the juvenile's familiarity with *Miranda* warnings or the ability to read and write in the language used to give the warnings;
> (4) any intoxication;
> (5) any mental disease, disorder, or retardation; and
> (6) the presence of a parent, guardian, or interested adult.

*Callahan*, 979 S.W.2d at 583. In holding that the defendant's waiver of his rights was voluntary, the *Callahan* court considered that the defendant was:

> reread his rights and verbally acknowledged that he understood his rights. He signed the *Miranda* forms. Both the atmosphere of the interrogation and the defendant's demeanor were calm. The defendant was permitted to take a break and was provided a snack and a soft drink. He possessed above-average intelligence and was able to read and write in the language used to convey his Miranda rights. The defendant was not under the influence of any intoxicants at the time of the waiver and did not appear to be suffering from any mental disorders. His demeanor during his statement was calm, polite, and cooperative.

*Id.*

16

In considering the totality of the circumstances in the present case, we look at the following factors: The Defendant voluntarily accompanied law enforcement to the police vehicle where he gave his statement. The interview was relatively short, lasting less than two hours in total. The Defendant was seated in the front of the police vehicle, unrestrained, and was told he was not in custody. The Defendant indicated that he understood his rights and had prior dealings with law enforcement, and he never asked for his mother, who was nearby, to be present. The Defendant requested to speak with one of the interviewers alone, and the second interviewer exited the vehicle as a result. The Defendant indicated he was not impaired and appeared sober. The Defendant exhibited an understanding of what was being asked and did not exhibit any signs of being confused. The Defendant signed a waiver of rights. He remained cooperative throughout while gradually revealing what happened inside the victim's apartment.

Based on our consideration of the foregoing circumstances, we agree with the State that the Defendant is not entitled to plain error relief because he has not carried his burden of showing that there was a clear and unequivocal breach of a rule of law. All the factors for consideration listed in *Callahan*, save one, indicate that the Defendant voluntarily waived his *Miranda* rights. We acknowledge the fact that the Defendant's mother was present inside their apartment but not on the scene when the Defendant gave his statement. His mother had the right as his parent to be present for the interview or to insist that he not give one. No such request was made. Because the factors weigh in favor of the Defendant's confession being voluntary, we conclude that he is not entitled to plain error relief on this issue.

**B. Sufficiency of the Evidence**

The Defendant contends that the evidence is insufficient to support his convictions. He contends that the State did not present sufficient proof that the Defendant was the proximate cause of the victim's serious injuries necessary to sustain his convictions for especially aggravated robbery and aggravated rape. The State responds that the evidence is sufficient from which the jury could conclude that the Defendant caused the victim's injuries and therefore that the evidence was sufficient to sustain his convictions. We agree with the State.

When an accused challenges the sufficiency of the evidence, this court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and

17

circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "'A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State.'" *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus[,] the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This court must afford the State the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

As relevant here, aggravated rape is the "unlawful sexual penetration of a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances: (1) Force or coercion is used to accomplish the act and the defendant is armed with a weapon; (2) The defendant causes bodily injury to the victim. T.C.A. § 39-13-502(a)(1), (2) (2018). Especially aggravated robbery is a robbery accomplished with a deadly weapon and where the victim suffers serious bodily injury. T.C.A. § 39-13-403(a).

Our supreme court has held that "causation in criminal cases generally is a question of fact for a properly instructed jury," and "a jury's determination of the causation issue will be reviewed under the familiar sufficiency of the evidence standard and will not be disturbed by an appellate court so long as the evidence is sufficient to support the jury's determination." *State v. Farner*, 66 S.W.3d 188, 203-04 (Tenn. 2001). The State points us to our decision in *State v. Locke* as determinative of this issue. 771 S.W.2d 132 (Tenn. Crim. App. 1988). The victim in *Locke*, after being raped by the defendant, jumped from her second-story apartment unit's window and suffered serious injury from her fall. *Id.* at 134. The trial court in *Locke* determined that the victim's injuries "sustained by her efforts to escape the wrath of the defendant by jumping from the second floor" were caused by the defendant. *Id.* at 136.

The Defendant contends that there was insufficient proof that he was the proximate cause of the victim's injuries because she chose to jump out the window, notwithstanding his criminal behavior at the time she made the decision. He contends that the State did not demonstrate a "causal relationship" between his conduct and her injuries, and that her decision to jump was not a "natural and probable consequence of his assaultive behavior." We disagree. While the victim's injuries were a direct result of her choosing to jump out the window, it is indisputable that her decision to do so was a natural and probable result of the Defendant's conduct. The victim stated that she thought the Defendant would kill her, so she chose the lesser consequence of suffering any injuries that she might sustain from jumping from her apartment. The Defendant may not have been the sole cause of the victim's injuries, but he was certainly the sole cause of the victim's act of flight, which caused her to sustain those injuries. For these reasons, we conclude that the evidence was sufficient from which a rational jury could have concluded that the Defendant caused bodily injury, sufficient to prove aggravated rape, and serious bodily injury, sufficient to prove especially aggravated robbery. The Defendant is not entitled to relief.

### C. Sentencing

Lastly, the Defendant contends that the trial court erred when it sentenced him. He contends that the trial court improperly enhanced his sentences to the maximum allowable sentence within the applicable range. He also contends that the trial court erred when it

imposed consecutive sentences. The State responds that the trial court properly imposed a within-range sentence. The State points out that the trial court considered the factors presented and declined to apply several enhancement factors while properly applying others to justify a sentence greater than the minimum. As to the imposition of partially consecutive sentences, the State contends that the trial court properly considered the applicable factors, namely the aggravated circumstances of the crime which occurred while the Defendant was on probation, as well as his extensive criminal history, and reasonably determined that consecutive sentences were justified. We agree with the State.

## 1. Enhancement of the Sentences

"Sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id.* at 554-55; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. So long as the trial court sentences within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id.* at 707.

The misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from a trial court's sentencing decision. *Id.* A reviewing court should not invalidate a sentence on this basis unless the trial court wholly departed from the principles of the Sentencing Act. *Id.* So long as there are other reasons consistent with the purpose and principles of sentencing, a sentence within the appropriate range should be upheld. *Id.*

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any

statement the defendant made in the defendant's own behalf about sentencing; and (8) the result of the validated risk and needs assessment conducted by the depart and contained in the presentence report. See T.C.A. § 40-35-210 (2019); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103 (2019).

We conclude that the trial court properly sentenced the Defendant. The trial court carefully considered the relevant principles and sentenced the Defendant to a within range sentences for each of his crimes. The trial court applied enhancement factor (6), that the victim suffered injuries that were particularly great, based on the severe injuries sustained by the victim, her lengthy hospital stay, trouble with physical mobility, and complicated childbirths. T.C.A. § 40-35-114(6) (2019). The trial court applied enhancement factor (9), that the Defendant brandished a knife while committing the crime, and enhancement factor (13), that the Defendant was on probation when he committed the offense. T.C.A. § 40-35-114(9), (13). All of these factors were supported by the evidence presented at trial and contained in the presentence report. As such, the appropriate application of enhancement factors supports the trial court's sentencing decision. The Defendant is not entitled to relief on this issue.

## 2. Consecutive Sentencing

Where a defendant is convicted of one or more offenses, the trial court has discretion in determining whether the sentences shall be served concurrently or consecutively. T.C.A. § 40-35-115(a). "[T]he abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations." *State v. Pollard*, 432 S.W.3d 851, 860 (Tenn. 2013). A trial court may order multiple offenses to be served consecutively if it finds by a preponderance of the evidence that a defendant fits into at least one of the seven categories in Code section 40-35-115(b). This court must give "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)[.]" *Pollard*, 432 S.W.3d at 861. When imposing consecutive sentences, the court must still consider the general sentencing principles that each sentence imposed shall be "justly deserved in relation to the seriousness of the offense," "no greater than that deserved for the offense committed," and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. §§ 40-35-102(1), -103(2), -103(4); *State v. Imfield*, 70 S.W.3d 698, 708 (Tenn. 2002). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Pollard*, 432 S.W.3d at 862 (citing Tenn. R. Crim. P. 32(c)(1); *Bise*, 380 S.W.3d at 705).

Here, the trial court found that consecutive sentencing was proper, pursuant to section 40-35-115(b)(2), because the Defendant had a record of extensive criminal activity, including six offenses which would be considered felonies. The trial court also determined that consecutive sentencing was proper based on the Defendant's excessively violent actions towards the victim which warranted the application of the dangerous offender factor. *Id.* § 40-35-115(b)(3). We agree. The Defendant is not entitled to relief as to this issue.

## III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE